IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **ATS OHIO, INC.,** | : | **Case No. 2:23-cv-4187** |
| | : | |
| **Plaintiff/Counter-Defendant,** | : | |
| | : | **Judge Algenon L. Marbley** |
| **v.** | : | |
| | : | **Magistrate Judge Vascura** |
| **ENERVENUE, INC.,** | : | |
| | : | |
| **Defendant/Counter-Plaintiff.** | : | |

**OPINION & ORDER**

This matter comes before this Court on Plaintiff/Counter-Defendant ATS Ohio, Inc.'s Motion for Sanctions against Defendant/Counter-Plaintiff EnerVenue, Inc. (ECF No. 33). For the reasons set forth herein, the Motion is **GRANTED** in part and **DENIED** in part.

## I.        BACKGROUND

This case is a contract dispute regarding a battery assembly system (the "System"). In 2021, California-based battery-producer EnerVenue, Inc. ("EnerVenue") sought someone who could construct an "automated system for the production of EnerVenue's 100 MWh [megawatt hour] batteries" in order to speed up its battery production. (ECF No. 18 ¶ 8). To that end, in mid-December 2021, EnerVenue engaged the Ohio-based ATS Ohio, Inc. ("ATS") to manufacture the 100 MWh battery-production system it sought. (*Id.* ¶¶ 8–9; ECF No. 1 ¶¶ 2, 21, 30; *see* ECF No. 17 ¶ 21).

The parties agree that this dispute is governed by a series of written agreements entered into between December 2021 to March 2023. (ECF No. 1 ¶¶ 1, 2, 39–41; ECF No. 18 ¶¶ 8–9).

According to ATS, EnerVenue never alleged that ATS had breached the parties' agreements from December 14, 2021 (when the Conditions of Sale were executed) to approximately March 27, 2023. (ECF No. 1 ¶ 40). Yet EnerVenue supposedly "stopped paying

ATS" altogether some time after March 27, 2023, so that it now owes ATS over $5.7 million.  (*Id.* ¶¶ 41–42).  ATS alleges that because of this failure to pay, it "eventually removed its personnel from EnerVenue's facility [in California] and cease[d] work," ultimately terminating its relationship with EnerVenue and demanding final payment on November 3, 2023.  (*Id.* ¶¶ 43–44; ECF No. 33-7).  EnerVenue did not pay the amount ATS sought.  Instead, on December 7, 2023, EnerVenue replied to ATS, referring to a June 16, 2023 letter from EnerVenue that had supposedly notified ATS that ATS was in breach, and claiming that *EnerVenue's* damages included the costs "of trying to get the line up and running after ATS left," and the cost of "EnerVenue personnel having to do manual work" since March 21, 2022.  (ECF No. 33-8).

On December 19, 2023, ATS brought suit, alleging breach of contract and seeking over $5.7 million in damages.  (ECF No. 1 ¶¶ 46–56).

EnerVenue's story is different.  According to EnerVenue, it performed its contractual obligations or was excused from performing them.  (ECF No. 18 ¶ 10).  Instead, *ATS* breached the contract in a variety of ways.  In EnerVenue's account, ATS and its affiliates failed to provide: the initial project schedule on time; the System's assembly process flow; key testing-related documents; component quantity requirements for testing protocols; and clear installation instructions for helium and nitrogen tanks.  (*Id.* ¶ 11).  ATS and its affiliates also supposedly failed to:  coordinate with subcontractors, ensure delivery of the System's first module, meet testing deadlines; obtain vendor support; determine System engineering tolerances; ensure ATS personnel performed adequately; ensure ATS personnel completed all hardware and software tasks; and avoid creating design flaws in the System.  (*Id.*).

2

Thus, on February 15, 2024, EnerVenue brought its own breach of contract claim, alleging that ATS failed to deliver ***the contractually-required, completed System of a sufficient quality*** in a timely manner, causing EnerVenue to sustain millions of dollars in damages.  (*Id.* ¶¶ 10, 12–17).

The parties subsequently engaged in discovery regarding their competing breach of contract claims, which was ultimately scheduled to last until May 5, 2025.  (*See* ECF No. 31). During this discovery, ATS inquired about the System's condition in April 2024.  (ECF No. 33 at 5; *see* ECF No. 35 at 2).  On or around May 10, 2024, EnerVenue provided responses and objections to, among other things, ATS's Interrogatory No. 5, in which ATS queried "how many 100 MWh batteries EnerVenue is ***currently*** able to manufacture each month using the System, even in its current state of completion."  (ECF No. 33-2 at 8) (emphasis added).  EnerVenue replied that it "is able to operate the line at a maximum capacity of approximately 20 MWh annually, or 20% of nameplate capacity," due to a missing automated stacking module from ATS's subcontractor, whose absence necessitated manual stacking, (*Id.*), and formed part of the basis for EnerVenue's breach of contract Counterclaim.

Also during discovery, at some time in the summer of 2024, EnerVenue videotaped the System in operation, and produced these videos to ATS.  (ECF No. 35 at 3).  On August 8, 2024, counsel for ATS and EnerVenue emailed back and forth about these videos, with counsel for ATS asking whether they "reflect the ***current*** state of the 100MWh System as it is currently operating," and EnerVenue's counsel—not really answering the question that ATS had asked—replying that "[t]he videos were taken of the assembly line this summer."  (ECF No. 33-3) (emphasis added).

On November 6, 2024,[1] ATS's counsel sent EnerVenue a Request to Inspect the System. (ECF No. 33-1; ECF No. 33 at 2).  The next day, EnerVenue's counsel replied, asking, "[ATS] want[s] to come inspect the current assembly line in operation (as it exists today), correct?"  (ECF No. 33-1).  ATS's counsel confirmed that was correct.

Days later, on November 12, 2024, EnerVenue's counsel informed ATS that "In approximately the summer of 2024," EnerVenue decided to "stop[] manufacturing the 100Mwh batteries" "for business reasons," and "[a]s a result of this decision, ***Enervenue disassembled the 100Mwh manufacturing assembly line***.  Accordingly, the company cannot comply with [ATS's] request to inspect an assembly line that no longer exists."  (ECF No. 33-1) (emphasis added).  This was the first time EnerVenue notified ATS that the System—central to EnerVenue's counterclaims and the litigation broadly—no longer existed, and had not existed for months.

On November 22, 2024, ATS served additional discovery requests on EnerVenue, naturally seeking a better understanding of why EnerVenue had destroyed the System.  (ECF No. 33 at 6). On January 7, 2025, EnerVenue provided responses and objections to, among other things, ATS's Interrogatories Nos. 1 and 2, in which ATS asked when the System had been decommissioned, and where the System's parts were.  (ECF No. 33-5 at 1).  EnerVenue replied that the System had been decommissioned and disassembled at some point during the week of July 7, 2024, and that the parts of the System "were nearly completely disassembled into individual components" in various locations.  (*Id.* at 1–2).  Although EnerVenue did not give a very clear accounting,

---

[1] ATS suggests that it issued its Request for Inspection to EnerVenue on November 8, 2024, while Exhibits 1 and 4 appear to show that the Request for Inspection was issued to EnerVenue's counsel on November 6, 2024.  (*Compare* ECF Nos. 33-1, 33-4 *with* ECF No. 33 at 2).  This Court will presume that Exhibits 1 and 4, which show an email and the Request for Inspection with a Certificate of Service each dated November 6, 2024, are correct.  Ultimately, this minor difference is immaterial.

apparently some parts of the System were still on-site in EnerVenue's California facility, some were destined for an EnerVenue facility in China (although it was unclear if they had already been shipped or had arrived), and still others were to be sold (although it was unclear whether any of these parts had actually been sold yet).  (*Id.*).

On February 20, 2025, ATS filed this Motion for Sanctions against EnerVenue, accusing EnerVenue of not only destroying the System during the summer of 2024, but of hiding the System's destruction from ATS until November 12, 2024.  (ECF No. 33 at 1–2, 17–18).  ATS asks this Court to:  (1) determine that lesser sanctions are insufficient; (2) enter judgment or dismiss EnerVenue's Counterclaim; (3) strike or dismiss EnerVenue's Affirmative Defenses; (4) order EnerVenue to pay ATS's attorneys' fees, costs, and expenses incurred in defending against the Countercomplaint, pursuing discovery on this issue, and prosecuting this motion; and (5) award other relief as determined to be just.

## II.        STANDARD OF REVIEW

Spoliation is the destruction of evidence presumed to be unfavorable to the party responsible for destroying it.  *NLRB v. Bannum, Inc.*, 93 F.4th 973, 982–83 (6th Cir. 2024) (per curiam).  Whether spoliation of physical evidence has occurred depends on a three-prong inquiry. Spoliation of electronically-stored information is governed by Fed. R. Civ. P. 37(e), though courts in the Sixth Circuit have applied the general three-prong inquiry for physical spoliation and the amended Rule 37(e) "in concert where they do not conflict."  *Blasi v. United Debt Servs., LLC*, 2020 WL 9597842, at *3 (S.D. Ohio June 24, 2020).

### A.  General Spoliation Sanction

A district court may sanction alleged spoliation if three conditions are met: (1) the party with control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the party destroyed the evidence with a culpable mind; and (3) the destroyed evidence was relevant to

5

the other side's claim or defense. *Pollard v. City of Columbus*, 2013 WL 5334028, at *3 (S.D. Ohio Sept. 23, 2013) (Marbley, J.) (citing *Byrd v. Alpha Alliance Ins. Corp.*, 518 F. App'x 380, 383–84 (6th Cir. 2013)); *NLRB*, 93 F.4th at 983; *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010). The party seeking spoliation sanctions bears the burden of proof. *Pollard*, 2013 WL 5334028 at *3; *Byrd*, 518 F. App'x at 384.

If and when those three conditions are met, at least some form of sanction is warranted, though the "strength" of the sanction is left up to the district court. *Flagg v. City of Detroit*, 715 F.3d 165, 177–78 (6th Cir. 2013). This is because district courts have "broad discretion in crafting a proper sanction for spoliation." *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009) (en banc). This discretion includes sanctions as severe as dismissal or summary judgment. *Id.* at 652–53. This general rule for spoliation sanctions is a remedy inherent to a federal district court's authority.

### B. Electronic Spoliation Sanction

To the extent a party may seek sanctions for spoliation of electronic information, Rule 37(e) of the Federal Rules of Civil Procedure governs. Under Rule 37(e), where "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced," a court *first* "may order measures no greater than necessary to cure the prejudice" if it finds prejudice to the other party from the information's loss. Fed. R. Civ. P. 37(e)(1).

*Second* and alternatively, a court may enter the sanctions of both permissive and mandatory adverse inferences, as well as outright dismissal and entry of default judgments, "upon finding that the party acted with the intent to deprive another party of the information's use." Fed. R. Civ. P. 37(e)(2).

Thus, under (e)(1), no culpable state of mind showing is required—only prejudice. Under the harsher sanctions of (e)(2), however, a heightened culpability—by showing intent—is required: "negligence or even gross negligence will not do the trick." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016). Either sanction is permissive—the district court elects whether to apply it.

### III.    LAW AND ANALYSIS

This Court analyzes the sought spoliation sanction both under the general sanction for the destruction of physical evidence and the Rule 37(e) sanction for the destruction of electronic information, because the automated 100MWh battery production System that ATS accuses EnerVenue of improperly destroying involved both hardware and software. (ECF No. 18 ¶ 11; ECF No. 33-10 at 3).

For the following reasons, this Court concludes: (1) ATS has met its burden of proving that EnerVenue spoliated physical evidence when it destroyed the System; but (2) to the extent that ATS seeks sanctions for the destruction of electronic information, ATS has not met its burden of proving spoliation of electronically-stored information because it has not shown that any electronically-stored information has actually been lost.

### A. General Sanction – Duty to Preserve

This Court finds that EnerVenue had an obligation to preserve the System. A party has an obligation to preserve evidence within its control when that party knows—or should have known—that the evidence might be relevant to litigation, including future litigation. *Byrd*, 518 F. App'x at 384; *Pollard*, 2013 WL 5334028 at *3 (quoting *Beaven*, 622 F.3d at 553), *Johnson v. Metro. Gov't of Nashville and Davidson Cnty., Tenn.*, 502 F. App'x 523, 532 (6th Cir. 2012). This standard is objective, not subjective. The first element is met if EnerVenue *should have known* that the evidence might be relevant to future litigation. *Byrd*, 518 F. App'x at 384.

7

The parties agree that EnerVenue had possession of the System when it was destroyed in July 2024, and has had possession stretching back at least to when ATS stopped working on the System around June 2023.  (ECF No. 33 at 9; ECF No. 35 at 2–3, 7).  They agree that ATS's Complaint was filed in December 2023, that prior to the Complaint the parties had been exchanging demand letters, and that in February 2024 EnerVenue filed a Counterclaim.  (ECF No. 33 at 10, ECF No. 35 at 4, 7).  And both parties appear to allege that their relationship soured around June 2023.  (ECF No. 35 at 7 (noting that this is when "ATS walk[ed] off the job"); *see* ECF Nos. 33-7, 33-8).  ATS argues that no matter when the precise time was, EnerVenue came under a duty to preserve the System prior to destroying it in July 2024.  (ECF No. 33 at 10; ECF No 36 at 2).  EnerVenue argues that "it had no duty to preserve the System itself in the absence of a [preservation] request by ATS." (ECF No. 35 at 9–10).

EnerVenue is incorrect.  EnerVenue's duty to preserve the System did not need to be triggered by a specific request from ATS.  To place the responsibility on ATS to ensure that the System was available for litigation would "turn this obligation on its head."  *Crown Battery Mfg. Co. v. Club Car, Inc.*, 185 F. Supp. 3d 987, 998 (N.D. Ohio 2016).  The obligation to preserve all relevant evidence existed here because EnerVenue should have known—and in fact, did know[2]— that the evidence might be relevant to litigation.  *See Pollard*, 2013 WL 5334028 at *5.

EnerVenue's obligation to preserve the System was unquestionably triggered in May 2024, when EnerVenue responded to ATS's Interrogatory regarding the "current[]" status of the System.

---

[2] That EnerVenue "videotaped the [S]ystem in operation" for this very litigation (ECF No. 35 at 11) before destroying it shows that EnerVenue was well-aware of its preservation obligations. Moreover, EnerVenue cites no legal authority to support its position that its preservation of certain documents is enough, or that there was "no duty to preserve the System itself in the absence of a request by ATS."  (*Id.* at 9–10).  It does not because it cannot—its legal obligation to preserve is clear.

(ECF No. 33-2 at 8).  But this obligation existed well before May 2024.  It existed in April 2024, when EnerVenue was sent said Interrogatory.  It certainly existed in February 2024, when EnerVenue filed its Counterclaim, as well as in December 2023, when ATS initiated this lawsuit. It already existed in November 2023, when ATS sent a demand letter to EnerVenue.  It appears to have first arisen all the way back in the summer of 2023, when contract-related litigation over the System was first foreseeable.  This was the time when the business relationship between the parties soured, EnerVenue stopped payment, and ATS stopped work on the System.

This Court finds that EnerVenue's preservation duties existed as early as June 16, 2023, when EnerVenue sent ATS a demand letter seeking nearly $5 million in damages for ATS's alleged failure to create and implement the System as contractually required.  (ECF No. 33-8).  In sum, EnerVenue had a duty to preserve the System as early as June 2023.  It certainly had a duty to preserve the System by the time that it destroyed the System in July of 2024.

### B.  General Sanction – Culpable State of Mind

This Court also finds that EnerVenue destroyed the System with a culpable state of mind. "To prove a 'culpable state of mind,' a party must demonstrate that the alleged spoliator 'destroyed the evidence knowingly or negligently.'"  *Pollard*, 2013 WL 5334028 at *3 (citing *Byrd*, 518 F. App'x at 384).  This inquiry "depends on the alleged spoliator's mental state regarding any obligation to preserve evidence and the subsequent destruction."  *Beaven*, 622 F.3d at 553.  "[T]he culpable state of mind element may be satisfied by showing only that the evidence was destroyed knowingly, even if without intent to breach a duty to preserve it, or negligently."  *Johnson*, 502 F. App'x at 532 (internal quotation marks and citations omitted).  The ultimate degree of fault found also informs the severity of the spoliation sanction.  *See* Section E, *infra*.

There is no real dispute between the parties about the state of mind requirement. Both parties agree that EnerVenue knowingly and intentionally disassembled the System. (ECF No 33 at 11; ECF No. 35 at 10). Instead, EnerVenue stresses that it did not dismantle the System "in bad faith"; rather, it "made a justifiable business decision to stop manufacturing its batteries and disassemble th[e] flawed and incomplete [S]ystem," which supposedly "was *essentially* losing money." (ECF No. 35 at 10) (emphasis added). EnerVenue places the blame on ATS for the absence of the first module's stacker, which supposedly would have critically aided the automation process. (*Id.*). EnerVenue points to its preservation of over 40,000 documents responsive to ATS's discovery requests as evidence that it did not intend to spoliate. (*Id.*).

ATS argues that EnerVenue destroyed the System deliberately and in bad faith—while pointing out that bad faith is not necessary for culpability or the sanction sought. (*See* ECF No. 33 at 10–12; ECF No. 36 at 3). ATS's case is bolstered by the Fourth Circuit's analysis in *Silvestri v. Gen. Motors Corp.*, especially given the centrality of the System to the litigation at issue here (as was the evidence destroyed in *Silvestri*), and the fact that unlike the spoliator in *Silvestri*, who failed to give notice about the destruction of central evidence *not* within his possession, EnerVenue actually had control and ownership of the evidence. (ECF No. 33 at 11 (citing *Silvestri*, 271 F.3d 583, 586, 591, 593–94 (4th Cir. 2001)). And while the Fourth Circuit in *Silvestri* concluded that "the conduct of the spoliator may have been either deliberate or negligent," *Silvestri*, 271 F.3d at 593, here, EnerVenue's actions were deliberate. ATS also advances that "bad faith could (and likely should) be found under the circumstances," although it concedes that it is possible that EnerVenue did not act in bad faith. (*See* ECF No. 36 at 2–4).

EnerVenue destroyed the System knowingly and willfully, and thus with a culpable state of mind. "Knowing destruction, even without intent to breach a duty to preserve, suffices to

establish spoliation." *Pollard*, 2013 WL 5334028 at *5 (citation and quotation marks omitted); *accord Byrd*, 518 F. App'x at 385.  EnerVenue's argument that its decision to destroy the System was a "business decision" (ECF No. 35 at 10) does not shield it from culpability.  EnerVenue is a sizable, sophisticated company, and claims to have made modifications to this "complex" System to try to make it work after ATS allegedly failed to do so.  (*Id.* at 5–7).  At the time of the System's destruction, EnerVenue was well aware of the litigation surrounding the System, as well as EnerVenue's need to preserve evidence in its possession at the time that it destroyed the System, especially considering EnerVenue's own supposedly herculean effort trying to get the System to work after ATS left.  *Cf. Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 517 (6th Cir. 2014) (recognizing that a "small company" might struggle more with discovery obligations, but suggesting conversely that "an information-technology company . . . could be expected to have a better-than-average understanding of . . . the necessity for . . . the preservation of data").

The knowing destruction of evidence that might be needed for ongoing litigation cannot be justified as merely an ordinary-course business practice.  *See Beaven*, 622 F.3d at 554 (distinguishing *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 796–97 (6th Cir. 2006)); *see also Crown Battery*, 185 F. Supp. 3d at 1000.  The fact that EnerVenue continually qualifies that the System was "essentially" losing money (ECF No. 35-2 ¶ 7) rather than simply asserting that it *was losing money* just raises the question of whether it was actually losing money, and serves to undermine EnerVenue's business rationale.  But even if the System was hemorrhaging money, that does not justify EnerVenue's unilateral action to destroy the System when EnerVenue could have either:  (a) at a minimum, notified ATS prior to the System's destruction; or (b) sought to recover additional money damages due to the System's failure, rather than destroy evidence.

11

EnerVenue's destruction of the System was certainly knowing and willful.  The remaining question is whether EnerVenue acted in bad faith.  "Bad faith can be shown where the party destroys evidence while knowing of its value to the litigation at the time of the destruction."  *In re Black Diamond Mining Co.*, 514 B.R. 230, 240 (E.D. Ky. 2014) (collecting cases).  Here, EnerVenue was manifestly aware of the value of the System to the litigation when it destroyed it—both in light of ATS's discovery interest in the System immediately prior to its destruction, and given the very nature of EnerVenue's Counterclaim.

EnerVenue points to its preservation of over 40,000 documents as demonstrating that it did not act in bad faith, but the question is whether EnerVenue acted in bad faith when it destroyed the evidence that appears to be most critical to this case.  EnerVenue does not suggest that these 40,000 documents would replace the need to examine the System, because it cannot.  EnerVenue also argues that this was a business decision.  That argument, along with the fact that EnerVenue videoed the System prior to taking it apart, appear to cut against EnerVenue's argument, as they merely demonstrate that EnerVenue was conscious of and considering the importance of the System generally, and understood its significance to the litigation.

Indeed, the fact that EnerVenue was put *directly on notice* regarding ATS's interest in the System in April and May 2024 makes the destruction of the System all the more suspicious, given that it took place mere months later.  *See Byrd*, 518 F. App'x at 387–89 (Griffin, J., concurring in part and dissenting in part) (arguing district court did not abuse discretion in finding bad faith where Byrd destroyed evidence of fire damage shortly after he was told that his insurer was interested in inspecting the evidence).  When EnerVenue responded to ATS's Interrogatories on May 10, 2024 and provided the "maximum capacity" that EnerVenue was able to operate the line at during that period of time, (ECF No. 33-2 at 8), EnerVenue became obligated, as a party "who

12

has responded to an interrogatory," to "supplement or correct its response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A). But EnerVenue failed to inform ATS that the System's maximum capacity effectively became 0% when it dismantled the System in July 2024. And EnerVenue *still* had not supplemented or corrected its response by August 2024 when ATS's counsel inquired as to whether EnerVenue's videos of the System reflected its "current" state. Even then EnerVenue, did not inform ATS that the System had been destroyed. (ECF No. 33-3).

EnerVenue's culpability here simply is "egregious." *Silvestri*, 271 F.3d at 593. This Court not only finds that EnerVenue acted culpably, it additionally finds that EnerVenue acted in bad faith when it destroyed the System.

### C. General Sanction – Relevance of Evidence

Finally, the System was relevant. Evidence is relevant to a party's claim or defense if it is shown that the evidence "'would have been relevant to the contested issue . . . such that a reasonable trier of fact could find that it would support [the moving party's] claim.'" *Byrd*, 518 F. App'x at 385 (quoting *Beaven*, 622 F.3d at 554–55).

Relevance does *not* require proof that the evidence would be "dispositive" of the party's claim. *McCarty v. Covol Fuels No. 2, LLC*, 644 F. App'x 372, 379 (6th Cir. 2016). But at the same time, the mere fact that the destroyed evidence has some "minimal relevance" may be insufficient for sanctions. *Johnson*, 502 F. App'x at 533.

Here, the System was relevant to EnerVenue's theory of the case, and thus ATS's defenses. Its relevance was not routine; it was significant. This Court finds that the System, as contracted for from ATS by EnerVenue and as constructed in part by both ATS and EnerVenue, is at the very heart of this breach of contract case.

EnerVenue argues that any inspection of the System that could have taken place after ATS's employees walked out in the summer of 2023 "would have resulted in ATS examining EnerVenue's work—not the condition of the System that existed when ATS departed the job." (ECF No. 35 at 11). But this is not for EnerVenue to decide unilaterally. For instance, ATS had employees who worked on the System in the summer of 2023, and who presumably were familiar with its state at that time, just as EnerVenue had employees who worked on the System after the ATS employees departed and presumably were familiar with the System's state at that time. (*Id.* at 7). Thus, it seems reasonable that EnerVenue's changes to the System could be determined, reviewed, and understood by both parties. If anything, EnerVenue's allegations that it had to modify the System due to ATS's breaches makes the System—in the condition it was *after* EnerVenue's modifications, prior to being destroyed—all the more relevant to EnerVenue's counterclaim at issue. Indeed, consistent with EnerVenue's theory of the case, the System supposedly would show evidence of the very mitigation that EnerVenue claims before it was destroyed. (*Id.* at 10–11).

As ATS points out, EnerVenue's Affirmative Defenses and Counterclaims rely in part on the System's status.[3] (ECF No. 33 at 13 (citing ECF No. 18 ¶ 11)). Indeed, EnerVenue asserted that "[a]s the proximate result of ATS' failure to perform its obligations under the Contract, the System was never completed in whole, of sufficient quality, or on time. ATS' breach has caused EnerVenue to sustain millions of dollars in recoverable damages." (ECF No. 18 ¶ 12). EnerVenue

---

[3] This Court agrees with ATS that EnerVenue's "Counterclaim [is] premised on allegations regarding defects in the System hardware, software, design, and testing," and that at least "[c]ertain of EnerVenue's Affirmative Defenses" appear to also be premised on the same, (ECF No. 33 at 13), though this Court finds that there is much less clarity to the extent that each of EnerVenue's individual affirmative defenses necessarily relates to the System. (*See, e.g.*, ECF No. 17 ¶ 60 ("Third Affirmative Defense[:] The Complaint is barred because Plaintiff has failed to perform its contractual commitments.")).

14

also claimed that, as part of its "obligations to mitigate," it sunk millions of dollars to make the System "workable," including making "significant modifications and repairs." (ECF No. 35 at 2–3).

ATS needs only to make some showing that the System would have been relevant to a contested issue. *Pollard*, 2013 WL 5334028 at *5. ATS has done so by suggesting several ways in which the System would be relevant to contested issues. (*See, e.g.*, ECF No. 33 at 12–13). This Court does find that "an opportunity to further examine and inspect the [System] itself would support" ATS's position. *Pollard*, 2013 WL 5334028 at *5. Just by way of one example, EnerVenue alleges that:

> ATS personnel did not complete all of the hardware and software tasks under the Contract—and when such work was performed, corners were cut. As one example, the vision system on the Cell 60 robot (used in the battery manufacturing process) was never properly created. EnerVenue even had to purchase its own replacement parts to fix ATS' failures.

(ECF No. 18 ¶ 11). Certainly, the physical System would be relevant to determining whether ATS performed all its hardware work, whether its performance of that work cut corners, and whether EnerVenue purchased replacement parts to address ATS's failures.

In this case, "there is an obvious link between" the System that EnerVenue destroyed and ATS's "ability to prove its defenses" to the breach of contract counterclaim. *Crown Battery*, 185 F. Supp. 3d at 1002. The System was central to EnerVenue's Counterclaims. Its relevance is clear. And ATS's inability to examine and inspect the System fundamentally hinders its ability to address EnerVenue's claims or sought damages.

In conclusion, EnerVenue was "sufficiently on notice of potential claims" as early as June 16, 2023, and had an obligation to preserve the System. *Beaven*, 622 F.3d at 554. Despite this notice, EnerVenue intentionally dismantled the System in the summer of 2024, destroying it in bad faith. And the System, despite EnerVenue's supposed modifications, was centrally relevant

15

to EnerVenue's counterclaims against ATS, and thus, ATS's potential defenses. EnerVenue thus spoliated evidence when it destroyed the System in July 2024.

### D. Rule 37(e) Sanction

Although ATS proves that EnerVenue spoliated physical evidence, ATS does not sufficiently show that EnerVenue spoliated any electronically-stored information when it dismantled the System. To obtain sanctions for a party's failure to preserve electronically-stored information, that information must be "lost because a party failed to take reasonable steps to preserve it." Fed. R. Civ. P. 37(e). Here, there is no showing that any electronic evidence was lost or destroyed when the System was destroyed. *See NLRB*, 93 F.4th at 983 ("Implicit in spoliation is the requirement that the evidence be actually lost or destroyed.").

To be sure, both parties agree that the System was a physical battery assembly line, but they also appear to agree that "software" and "code" were important to the System. (ECF No. 33-10 at 3; ECF No. 18 ¶ 11; *see* ECF No. 33-4 ¶ 1 (ATS's Request for Inspection sought "access to any/all computers and/or computer code *supporting*" "[a]ll components of the 100Mwh manufacturing assembly line" (emphasis added))). Therefore, it is not at all clear whether EnerVenue's dismantling the System also included the destruction of the code or software that was a part of the System. While ATS's Senior Systems Engineer stated in his declaration that "ATS cannot investigate the state of the System *or code* to assess whether adjustments were made" "[b]ecause the System is destroyed," (ECF No. 33-10 ¶ 14) (emphasis added), it is unclear whether he meant that ATS could not investigate the state of the code because the System that it coded was destroyed, or because the code was also destroyed along with the System. Indeed, ATS's follow-up interrogatories with EnerVenue in January 2025 obtain clarification from EnerVenue that the

assembly line was completely dismantled, but the parties do not discuss the state of the code itself. (ECF No. 33-5 at 1–2).

The parties do not directly brief the issue of spoliation of electronically-stored information.[4] "[A]lleged software errors" may be relevant in some way, (ECF No. 33 at 16; *see* ECF No. 18 ¶ 11), but to the extent that ATS's motion is can be construed to seek sanctions for the destruction of electronically-stored information, (*see* ECF No. 33 at 17; ECF No. 33-10 ¶ 14), no evidence of destruction of electronically-stored information has been presented.

### E. Appropriate Sanction

Having determined that physical spoliation of the System occurred, the Court must now craft an appropriate sanction. "[A] proper spoliation sanction should serve both fairness and punitive functions*.*" *Adkins*, 554 F.3d at 652. The severity of sanctions issued is determined on a case-by-case basis, depending in part on the spoliating party's level of culpability. *See Flagg*, 715 F.3d at 178. This sanction selection is up to the district court, which has "broad discretion" in selecting the appropriate sanction. *Adkins*, 554 F.3d at 653; *Automated Sols. Corp.*, 756 F.3d at 516 ("[D]istrict courts are best positioned to adjudicate discovery disputes, as they have the most contact with the parties, the personalities, and the litigation. We have previously characterized the inquiry into a party's degree of fault as 'fact-intensive' and within the 'broad discretion' of the district courts.").

In this case, ATS requests the dismissal of EnerVenue's Counterclaim, that certain of EnerVenue's Affirmative Defenses be stricken or dismissed, and attorneys' fees. (ECF No. 33 at 2 n.1, 17). Dismissal is a severe remedy, should be avoided if a "lesser sanction" will suffice, and

---

[4] EnerVenue does reference Rule 37(e).

is only justified in certain circumstances, such as "bad faith," *Silvestri*, 271 F.3d at 590, 593, or "when significant prejudice results from the evidence's destruction," *Byrd*, 518 F. App'x at 386.

Having already found that EnerVenue's culpability was in bad faith, *see* Section B *supra*, this Court now considers whether ATS was severely prejudiced by the System's destruction. Thus, this Court evaluates the request for dismissal for fairness and punishment.

*1.  Fairness*

EnerVenue advances two arguments relating to the fairness of any spoliation sanction, challenging that ATS experienced any prejudice from the System's destruction. Both these arguments fall flat.

First, EnerVenue argues that even if the System was relevant in July 2024, ATS was not prejudiced by its destruction because EnerVenue took videos. But there is no showing that some unspecified number of videos of unspecified duration that EnerVenue took in July 2024 and produced to ATS are even *close* to sufficient to "demonstrate how the [S]ystem was working as of the summer of 2024." (ECF No. 35 at 11). As EnerVenue itself points out, "the System itself was of a very large physical size—with multiple modules taking up tremendous space (larger than a high school sports gymnasium)," (*Id.*), it was "complex," (*Id.* at 1), and it involved sophisticated mechanisms, both "hardware and software," (ECF No. 18 ¶ 11). ATS argues that it would need to inspect the System itself. (ECF No. 33-10 ¶ 4). This Court agrees, and will not credit the EnerVenue's self-serving notion that EnerVenue's own produced videos would be the same as a hands-on inspection by ATS's own engineers or experts. *See Silvestri*, 271 F.3d at 594 ("To require [the party disadvantaged by spoliation] to rely on the evidence collected by [the spoliating party's] experts in lieu of what it could have collected would result in irreparable prejudice."). EnerVenue's first argument fails.

Separately, according to EnerVenue, because ATS refuses to produce the first module stacker for inspection, ATS is not prejudiced by the System's destruction. To the extent that EnerVenue argues that ATS's failure to produce the stacker for inspection is analogous to EnerVenue's known destruction of the System, EnerVenue creates a false equivalency. First, EnerVenue has presented no evidence that ATS is even in control of the stacker, even conceding that the stacker was the responsibility of a subcontractor. (ECF No. 35 at 11; *see* ECF No. 36 at 5–6). Second, it appears that EnerVenue's request was made in March 2025—*i.e.*, not more than 11 days before its Opposition to ATS's motion was filed. (ECF No. 35; ECF No. 35-1 at 2). EnerVenue cannot draw an equivalency between its destruction of the System that it had a concrete obligation to preserve, and its conclusory assertion that "ATS did not undertake efforts to preserve (or produce for inspection) the stacker that was part of the very same system." (ECF No. 35 at 11). Indeed, this Court observes that EnerVenue obfuscated the System's destruction for many months—yet expects to hold ATS immediately responsible for its subcontractors. EnerVenue offers no evidence that ATS failed to preserve the stacker, and does not show that ATS should have been able to produce it for inspection. Regardless, EnerVenue creates a false equivalency when it equates its destruction of the System with whatever it is accusing ATS of doing. *See NLRB*, 93 F.4th at 983 ("Implicit in spoliation is the requirement that the evidence be actually lost or destroyed."). EnerVenue's second argument also fails.

Even assuming *arguendo* that EnerVenue is correct and ATS has destroyed or wrongfully withheld the stacker, either directly or through its subcontractor, ATS is still significantly prejudiced by the destruction of the System. That is, EnerVenue's breach of contract Counterclaim is premised on a variety of ATS's alleged failures to perform—of which, the failure to deliver the stacker is just one example. (*See* ECF No. 18 ¶¶ 11–12). If EnerVenue can actually *prove*

spoilation on ATS's behalf, then it would be entitled to separate relief. But mere conclusory accusations and hypotheses, cobbled together without evidence, are insufficient.

Contrary to EnerVenue's claims, ATS is severely prejudiced by the destruction of the System. Given its scale and complexity, the System was likely the key evidence from which ATS could develop its Counterclaim defenses adequately. This Court now determines which sanction would serve the punitive function appropriately.

2.     *Punishment*

ATS seeks a severe punishment in requesting judgment, dismissal, and striking remedies. Harsher sanctions are more appropriate for those with greater culpability than negligence, *Frank v. Good Samaritan Hosp. of Cincinnati*, 2023 WL 2523297, at *2 (6th Cir. Mar. 15, 2023), and bad faith is "most appropriately taken into consideration when adjusting the sanction imposed," *see Johnson*, 502 F. App'x at 533.

Having previously found that EnerVenue acted knowingly, willfully, and in bad faith when it spoliated evidence, this Court concludes that a harsh punishment is in order. Given the System's "critical relevance" to EnerVenue's Counterclaim against ATS, and given that discovery was already ongoing and ATS had already requested information regarding the System's current operational capacity, EnerVenue should have "ensure[d] that the evidence was preserved." *Arch Ins. Co. v. Broan-NuTone, LLC*, 590 F. App'x 453, 458 (6th Cir. 2012). As previously discussed, this Court concludes that EnerVenue's conduct was simultaneously egregious under the circumstances and overwhelmingly prejudicial to ATS, militating in favor of a severe sanction. *See Silvestri*, 271 F.3d at 593; *accord Rhodes Risinger Bros. Transfer, Inc. v. Intermodal Repair Servs., Inc.*, 2016 WL 4536443, at *4–5 (W.D. Ky. Aug. 30, 2016) (finding alternative spoliation grounds for summary judgment where the spoliator's failure to keep "critical" physical evidence

was "highly prejudicial" to a party's ability to "develop[] its defenses"). EnerVenue's "fault is clear, the prejudice . . . manifest, and the spoliation [of the System] total. In these circumstances, [the spoliating party] 'should bear the risk of prejudice from [its] failure' to preserve" evidence. *Crown Battery*, 185 F. Supp. 3d at 1003 (citation omitted).

EnerVenue had many reminders and opportunities to preserve the System after its dispute with ATS began. It failed to do so. And it was required to supplement or correct its interrogatory responses after it destroyed the System, Fed. R. Civ. P. 26(e)(1)(A), which it also did not do for months, while continuing to mislead ATS's counsel.[5] Rather than engage properly with its discovery obligations and "work cooperatively" with ATS "to narrow the relevant issues and elicit the relevant facts," EnerVenue appears to have "engage[d] in a game of litigation semantics," *Alcorn v. Parker Hannifin Corp.*, 2013 WL 12121515, at *2 (S.D. Ohio June 27, 2013), obfuscation, and misdirection. (*See* ECF No. 33-3). This Court therefore weighs EnerVenue's apparent bad faith and gamesmanship in crafting an appropriate sanction.

First, while this Court will not enter judgment in ATS's favor on the Counterclaim, it does find that dismissal of the Counterclaim in its entirety is warranted. EnerVenue cannot premise a breach of contract Counterclaim on ATS's supposed "failure to perform its obligations," (ECF No. 18 ¶ 12), when the best evidence for ATS's performance (or lack thereof) has been destroyed due to EnerVenue's action. EnerVenue cannot use the System simultaneously as a sword to attack ATS through its breach of contract Counterclaim—while also shielding itself from scrutiny over the single-most relevant and central piece of evidence to that counterclaim—by dismantling the System.

---

[5] Its failure to do this also allows this Court to fashion sanctions pursuant to Fed. R. Civ. P. 37(c)(1) and Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi).

As to EnerVenue's Affirmative Defenses, this Court declines to strike or dismiss any defenses. Despite ATS's request, none of the defenses is solely "founded on the System's condition or performance." (ECF No. 33 at 2; *id.* at 2 n.1). Instead, this Court finds that a mandatory adverse inference instruction is justified—insofar as, and to the extent that, each defense concerns the System's condition, performance, quality, or completion. (ECF No. 33 at 2; ECF No. 18 ¶ 12). "An adverse inference instruction is an appropriate sanction when the destruction of evidence 'severely compromise[s]' the opposing party's case." *Cap. Senior Living, Inc. v. Barnhiser*, 713 F. Supp. 3d 407, 418–19 (N.D. Ohio 2024) (citation omitted).

Finally, this Court awards ATS its attorneys' fees, costs, and expenses associated with defending against EnerVenue's Counterclaim, preparing and litigating this motion, and engaging in additional, unnecessary discovery due to the spoliation of the System.

### IV.    CONCLUSION

For the reasons explained above, Plaintiff/Counter-Defendant ATS's Motion for Sanctions is hereby **GRANTED** in part and **DENIED** in part. ATS's request for an entry of judgment regarding Defendant/Counter-Plaintiff EnerVenue's Counterclaim is **DENIED**. ATS's request to strike or dismiss certain of EnerVenue's affirmative defenses is **DENIED**. ATS's request for attorneys' fees, costs, and expenses is **GRANTED**.

The Court hereby **ORDERS** that a mandatory adverse inference instruction against certain of EnerVenue's affirmative defenses will be given at trial.

The Court **DISMISSES** EnerVenue's Counterclaim.

Within 14 days of the date of this Order, ATS shall submit a statement of its attorneys' fees, costs, and expenses associated with defending against EnerVenue's Counterclaim, preparing and litigating this motion, and engaging in discovery due to EnerVenue's spoliation of the System.

Once ATS has submitted its statement of attorneys' fees, costs, and expenses, EnerVenue shall have 14 days to respond, and after EnerVenue has responded, ATS shall have 7 days to reply.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: September 25, 2025**